IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| GALEN S. BARTLING,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>WAL-MART STORES, INC.,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br><br>Case No. 2:10-cv-00708<br><br>Judge Dee Benson |

Before the Court is Defendant Wal-Mart Stores, Inc.'s ("Defendant") Motion for Summary Judgment as to Plaintiff Galen S. Bartling's ("Plaintiff") Complaint (Dkt. No. 12). Plaintiff's Complaint alleges four causes of action against Defendant. Three of Plaintiff's causes of action arise under the Americans with Disabilities Act ("ADA"): (1) disability discrimination; (2) failure to accommodate; and (3) retaliation. Plaintiff's fourth cause of action is a wrongful termination claim brought under Utah law. The first issue the Court must determine is whether Plaintiff has raised genuine issues of material fact as to each of his four causes of action.

If Plaintiff demonstrates that genuine issues of material fact exist in his discrimination and retaliation claims, the Court must then determine whether a question of fact exists regarding whether Defendant terminated Plaintiff for legitimate, non-discriminatory reasons or if

Defendant's alleged reasons for Plaintiff's termination were merely pretextual. The Court heard

oral argument on this matter on May 14, 2012. The Court now issues the following

Memorandum Decision and Order.

## I.  FINDINGS OF FACT

Plaintiff began working for Defendant as a cashier at Defendant's West Jordan, Utah

store in August 2003. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 1 (Dkt. No. 13)). Plaintiff was

forty-four years old at the time of his hiring. *Id.* at  ¶ 2. Upon hiring Plaintiff, Defendant

informed Plaintiff of its rules and policies regarding attendance, breaks, and customer service.

*Id.* at ¶ 3.

### A.  Defendant's Progressive Discipline Policy

Preliminarily, it is important to describe Defendant's "progressive discipline policy."

Under Defendant's progressive discipline policy, there are three levels of coaching: verbal,

written, and "Decision Day." (Def.'s Reply Mem. Supp. Mot. Summ. J. ¶ 2 (Dkt. No. 19)).

Decision Day is followed by termination. *Id.* When an employee receives a coaching, the

employee must go twelve months without incurring another coaching to clear his record. *Id.*

If an employee receives another coaching within twelve months, the subsequent coaching

will be made at the next level of discipline. *Id.* This will continue until the employee has

reached Decision Day status. *Id.* If the employee receives a subsequent coaching within twelve

months of being placed on Decision Day status, the employee will be immediately terminated.

*Id.* Defendant's progressive discipline policy *does not* require that the successive coachings be

for the same type of conduct; any infraction will trigger the subsequent level of discipline. *Id.*

**B.  Plaintiff and Defendant's Employment History**

**1.  The Early Years: 2004-2006**

Plaintiff was issued his first verbal coaching on February 13, 2004, for degrading customers and treating customers disrespectfully on three occasions.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 4 (Dkt. No. 13); Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 3 (Dkt. No. 17)).  Pursuant to Defendant's progressive discipline policy, Plaintiff was instructed that future violations of Defendant's rules, policies, and instructions would result in additional coachings and warnings up to, and including, termination.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 4 (Dkt. No. 13)).  This coaching expired in February 2005.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 3 (Dkt. No. 17)).

Plaintiff received another verbal coaching on April 7, 2006, for responding disrespectfully and in an insubordinate manner to an assistant manager, and for refusing to do an assigned task.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 5 (Dkt. No. 13); Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 4 (Dkt. No. 17)).  In this instance, an assistant manager asked Plaintiff to bring in shopping carts.  *Id.*  Plaintiff refused to bring in the carts because of a back condition that he had documented with Defendant when he was hired. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 4 (Dkt. No. 17)).  The exchange between Plaintiff and the assistant manager became heated, and resulted in Defendant issuing the coaching.  *Id.*  Plaintiff was again instructed that future violations would result in additional coachings and written warnings up to, and including, termination. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 5 (Dkt. No. 13).  This coaching was set to expire in April 2007.

3

**2. Plaintiff's Broken Hand**

In May 2006, Plaintiff broke his hand while at work. *Id.* at ¶ 18. Plaintiff sought medical care and thirty days later received surgery to repair his hand. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 1 (Dkt. No. 17)). Plaintiff returned to work with Defendant in July 2006. *Id.*

Plaintiff was warned not to drive while taking the pain medications that he was prescribed following his surgery. *Id.* at 34. So, upon his return, Plaintiff discussed with Defendant his need for a flexible starting time based on his wife's ability to drive him to work. *Id.* at 16. Plaintiff did not, however, look for or arrange other means of transportation. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 26 (Dkt. No. 13)). Defendant agreed that Plaintiff could have a flexible start time. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 6 (Dkt. No. 17)).

**3. Relationship Between Plaintiff and Defendant Further Declines: 2006-2007**

In September 2006, Plaintiff was reassigned to Defendant's "Connections Center." *Id.* at 16. The Connections Center is the cellular phone department in Defendant's retail stores. At the time of his reassignment, Plaintiff had another verbal conversation with Defendant regarding a flexible start time based on his wife's ability to drive him to work. *Id.* Plaintiff contends that Defendant again agreed to a flexible start time. *Id.* at 21. Conversely, Defendant maintains that Plaintiff was merely permitted to change his hours of availability; Defendant does not admit to agreeing that Plaintiff could arrive at work whenever he was able. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 25 (Dkt. No. 13)).

On October 16, 2006, Plaintiff received Defendant's "Attendance/Punctuality Policy." *Id.* at  ¶ 7. Plaintiff acknowledged reviewing and understanding the Attendance/Punctuality

Policy and agreed to be held accountable for his attendance.  *Id.*

On February 23, 2007, Plaintiff submitted a "Reasonable Accommodation Form" to Defendant.  *Id.* at ¶ 19.  Plaintiff indicated that he was impaired due to the "loss of use of dominant hand - Right," and that this impairment limited his ability to lift bulky or heavy items and also limited his ability to drive to work.  *Id.*  Plaintiff requested three accommodations:

> (a)  "Allowing a non-water drink under the cabinet for pain medication"; *Id.*
>
> (b)  "Dressing professional without a vest"; *Id.* and
>
> (c)  "excused tardies – Drs, therapy, wife having to drive me until new schedule is set."  *Id.*

Before Defendant responded to Plaintiff's accommodation requests, an incident occurred on February 25, 2007, in which Defendant issued Plaintiff his second coaching in less than twelve months.  This written coaching was issued for Plaintiff's use of profane language and lack of respect for management and other associates.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 8 (Dkt. No. 13)).  The incident behind this coaching started when Defendant's new department manager approached Plaintiff about changing his availability from 7:00 a.m. to 3:00 p.m. so that Defendant could make Plaintiff a manager in the Connections Center.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 6 (Dkt. No. 17)). Plaintiff explained that he could not accept the hours because his wife could not drive him to and from work at those times.  *Id.*  The conversation escalated into an argument and resulted in Defendant issuing the written coaching.  *Id.* at 7.

Plaintiff strongly disagreed with the reasons for the coaching.  *Id.*  Moreover, Plaintiff alleges that he never validated the coaching by signing it.  *Id.* at 6.  Plaintiff further alleges that this incident and the coaching were in violation of Defendant's Discrimination and Harassment

Prevention Policy.  *Id.* at 7.

In March 2007, Defendant requested that Plaintiff provide medical information from his doctor to support the requested accommodations that he made in his Reasonable Accommodation Form.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 20 (Dkt. No. 13)).  Plaintiff responded on June 26, 2007, with a note from his physician. The note indicated that Plaintiff was "unable to use ⓡ hand" and that "[Plaintiff] should be able to have non-water beverage on sales floor."  *Id.* at ¶ 21.  The note did not describe any major life activity affected by Plaintiff's broken hand.  *Id.*  The note did not request any other accommodation.  *Id.*

Plaintiff never submitted any supporting documentation from his physician that indicated Plaintiff needed to be excused from wearing Defendant's vest or smock.   (Def.'s Mem. Supp. Mot. Summ. J. ¶ 22 (Dkt. No. 13)).  After Plaintiff made his request, Defendant changed its policy, and no longer required employees to wear the vest or smock.  *Id.* at ¶ 18.

Plaintiff's physician did not explain why Plaintiff's hand injury required him to drink a non-water beverage.  *Id.* at ¶ 21.  Nonetheless, Defendant never addressed Plaintiff's use of a non-water beverage; Defendant simply continued to allow Plaintiff to have a non-water beverage on the sales floor.  (Def.'s Reply Supp. Mot. Summ. J. 3 (Dkt. No. 19)).

Finally, Plaintiff never submitted any supporting documentation from his physician or any other medical professional that indicated Plaintiff needed accommodations to be allowed to start work whenever he was able to arrive at work.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 22 (Dkt. No. 13)).

**4.  Plaintiff Reaches Decision Day Status and Termination**

On June 2, 2007, Plaintiff was warned about his excessive absences in the preceding six months.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 9 (Dkt. No. 13)).  At this point, Defendant had not taken any formal action in response to Plaintiff's February 27 accommodation request regarding Plaintiff's excused tardies.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 9  (Dkt. No. 17)).  Plaintiff took exception to Defendant's warning based on Defendant's non-response and his impression that Defendant had allowed Plaintiff to have a flexible start time.  *Id.* at 6-9.  Why Plaintiff believed Defendant's non-response to his request for excused tardies related in any way to the warning regarding his excessive absences is unclear.  Nonetheless, Plaintiff alleges that the absences were workers' compensation related, and, consequently, the warnings violated Defendant's Discrimination and Harassment Prevention Policy.  *Id.*  at 7.  In spite of this incident, Plaintiff did not clarify when he was required to arrive at work.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 28 (Dkt. No. 13))

On June 21, 2007, Defendant issued Plaintiff another coaching that stemmed from three unapproved absences in June 2007.  *Id.* at ¶ 10.  Plaintiff was also disciplined for making inappropriate comments to a fellow associate.  *Id.*  These coachings put Plaintiff on Decision Day status.  *Id.*  Plaintiff was instructed that future violations of Defendant's rules, policies, and instructions would result in immediate termination.  *Id.*   While Plaintiff admits to validating this written coaching, he again alleges that the coaching was discriminatory because Defendant had not formally acted on Plaintiff's request for excused tardies. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 8 (Dkt. No. 17)).

As a result of the June 21st coaching and Plaintiff's Decision Day status, Plaintiff was required to develop an action plan that specified how he intended to correct his deficient behavior. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 12 (Dkt. No. 13)). In his action plan, Plaintiff stated that he would "change [his] availability so that he would not be tardy for his shifts." *Id.* He also stated that he would "be more sensitive to other associates." *Id.*

Plaintiff formally submitted an Associate Availability Change Form, and on June 23, 2007, Plaintiff's schedule was changed. *Id.* at ¶ 29; Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 23 (Dkt. No. 17). Plaintiff's availability forms showed that he would never be available for work before 1:00 p.m. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 23 (Dkt. No. 17)). Defendant recognized this availability change. *Id.* at 11. After this change, there were no further issues with Plaintiff arriving tardy to work. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 30 (Dkt. No. 13)).

Plaintiff had an annual review on July 5, 2007, wherein Plaintiff was rated as meeting expectations in twenty-nine out of thirty areas. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 12 (Dkt. No. 17)). However, Plaintiff was given a "below expectations" rating on dependability due to his excessive absences and tardies. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 13 (Dkt. No. 13)). In addition, under "Areas of Improvement," Plaintiff was told to watch his attendance and that he needed to be willing to help customers outside his area, to show respect for individuals at all times, to communicate better with co-workers, and to learn more about Defendant's culture, policies, and procedures. *Id.*

In the fall of 2007, one of Defendant's managers observed that Plaintiff was not in the Connections Center and that there were customers waiting. *Id.* at ¶ 14. Employees of Defendant

reviewed Defendant's surveillance tapes and identified at least five instances where Plaintiff was away from the Connections Center for longer than his authorized fifteen minute breaks.  In at least one instance, Plaintiff was away from the Connections Center for twenty-six minutes.  *Id.*

Plaintiff admits to taking breaks longer than fifteen minutes, but he also alleges that some of the breaks he took were for lunch which were for thirty minutes, while some were for regular, shorter breaks.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 12-13 (Dkt. No. 17)).  Plaintiff denies taking breaks that were different from other employees.  *Id.* at 13.  He also alleges that his work responsibilities "took him all around the premises at any time (back area of the store, electronics area, parking lot, etc.)," which may account for his absence from the Connections Center.  *Id.* at 12-13.  Plaintiff does not, however, give specific examples of these absences in the record.

Given the new violations and Plaintiff's Decision Day status, Defendant immediately terminated Plaintiff from employment on October 20, 2007.  (Def.'s Mem. Supp. Mot. Summ. J. 1 (Dkt. No. 13)).  Defendant stated that it terminated Plaintiff because Plaintiff had a long history of disciplinary actions and because Plaintiff was taking excessive paid breaks that were unauthorized by Defendant.  *Id.* at I-ii.

Plaintiff alleges that after returning from his surgery, Defendant built a case against him and fired him because of his disability.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 1 (Dkt. No. 17)).  Plaintiff brought this case against Defendant in August 2010.

## II.  STANDARD OF REVIEW

### A.  SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  "A disputed fact is 'material' if it might affect the outcome of the suit under the

governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir.

1997).

"The nonmovant . . . must bring forward specific facts showing a genuine issue for trial

as to those dispositive matter for which he or she carries the burden of proof." *Garrison v.

Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).  "The mere existence of a scintilla of evidence

in support of the nonmovant's position is insufficient to create a dispute of fact that is

'genuine.'" *Id.*  A court considering summary judgment should consider the evidence in the

light most favorable to the non-moving party.  *See, e.g.*, *Gwinn v. Awmiller*, 354 F.3d 1211, 1215

(10th Cir. 2004).

## III.  ANALYSIS

### A.  DISABILITY DISCRIMINATION

### 1.  Discrimination Legal Standard

To make a prima facie case for discrimination under the ADA, Plaintiff must establish

that: (1) he is a disabled person within the meaning of the ADA; (2) he is qualified, that is, with

or without a reasonable accommodation, he is able to perform the essential functions of the job;

and (3) he suffered an adverse employment action because of his disability.  *White v. York Int'l

Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995).  Plaintiff bears the burden of establishing a prima

facie case of discrimination.  *See Morgan v. Hilti*, *Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

If Plaintiff makes out a prima facie case, Defendant may defeat the case by demonstrating

that it had legitimate, non-discriminatory reasons for the challenged employment action.  *See id.*

Plaintiff must then establish that "there is a genuine dispute of material fact as to whether the

employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief."

*Id.* (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)).  "Whatever the

employer's decision making process, a disparate treatment claim cannot succeed unless the

employee's protected trait actually played a role in that process and had a determinative

influence on the outcome."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

## 2.  Discrimination Analysis

### a.  Plaintiff's Prima Facie Case

Only one of the three elements that Plaintiff must establish to make a prima facie case of

discrimination was raised by the parties in their memoranda: whether Plaintiff qualifies as an

employee capable of performing the essential functions of his job, with or without a reasonable

accommodation.

Plaintiff relies on *Sista v. CDC IXIS No. Am. Inc.*, 445 F.3d 161 (2nd Cir. 2006), for the

proposition that, under the ADA, an employee's misconduct in a work environment is distinct

from the minimal qualifications to perform a job.  *See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 27

(Dkt. No. 17) ("Certainly, an employer may require, as an essential function of the job, that an

employee not engage in gross misconduct . . . but having the issue of whether an employee is a

qualified individual with a disability turn on an employer's subjective assessment of an

employee's 'attitude' is . . . going too far.").  The *Sista* court held that, "misconduct is distinct . .

. from the issue of minimal qualifications to perform a job.  An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive."  *Sista*, 445 F.3d at 171.  Plaintiff alleges that Plaintiff may not have been the perfect employee because of his misconduct, but he still demonstrated the minimal qualifications to perform his job.  *Id.* at 28.

The Court finds Plaintiff's reasoning persuasive.  While there is an argument to be made as to the inappropriateness of Plaintiff's conduct for his alleged disrespect towards customers and coworkers, his tardiness, absences, and excessive breaks, there is no question that Plaintiff still demonstrated the minimal qualifications to perform his job.  *See Sista,* 445 F.3d at 171-72.

Defendant argues that Plaintiff's misconduct demonstrates that Plaintiff was not capable of performing the essential functions of his job.  But what Defendant does not show is that Plaintiff could not perform the minimal qualifications of his job.  The weight of the evidence actually shows that Defendant believed Plaintiff could perform the essential functions of his job.  They employed him for four years, offering at one point to make Plaintiff a manager in the Connections Center.  His work was rated as "meeting expectations" in the vast majority of the areas in his annual reviews.  Such conduct does not demonstrate an employer who believes Plaintiff is incapable of performing the essential functions of his job.

Based on the evidence in the record and on the reasoning above, Plaintiff has demonstrated that he was able to perform the essential functions of his job, with or without a reasonable accommodation.

**b. Defendant's Legitimate, Non-Discriminatory Reasons**

Even though Plaintiff has established a prima facie case of disability discrimination, the record clearly indicates that Defendant had a legitimate, nondiscriminatory reason for terminating Plaintiff: Plaintiff was subject to immediate termination following his placement on Decision Day status once he received another coaching.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 17 (Dkt. No. 13)).  Plaintiff was put on Decision Day status in June 2007 for three unexcused absences and for making inappropriate comments to coworkers.  *Id.* at ¶ 10.  Plaintiff knew if he received another coaching while on Decision Day status within the following twelve months he would be immediately terminated.  *Id.*  at ¶ 3.  Plaintiff thereafter took unauthorized breaks that exceeded the fifteen minutes provided by Defendant's policy.  *Id.* at ¶ 14.  This violation resulted in another coaching for Plaintiff and Plaintiff was immediately terminated.  *Id.* at ¶ 17.  Defendant thus clearly terminated Plaintiff for a legitimate, non-discriminatory reason.

In addition, Plaintiff has failed to put forward adequate evidence that Defendant's proffered reasons for terminating Plaintiff were pretextual.  *See Morgan*, 108 F.3d at 1323.  Plaintiff argues that Defendant's proffered reasons were pretextual because: (1) Defendant treated Plaintiff differently following his hand injury; and (2) Defendant treated Plaintiff differently than other employees.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 29-30 (Dkt. No. 17)).

The Court agrees with Defendant that Plaintiff has relied too heavily on speculation in trying to show Defendant's proffered reasons were pretextual, and  "[m]ere speculation is insufficient to thwart summary judgment."  *Neider v. Board of County Commissioners of County or Republic, Kansas*, 582 F.3d 1155 (10th Cir. 2009); *see also Bones v. Honeywell Int'l, Inc.*,

366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise").  It is clear that Plaintiff firmly believes Defendant's reasons were pretextual; nevertheless, Plaintiff must still present admissible evidence demonstrating Defendant's proffered reasons were pretextual and he has failed to do so.

For example, to demonstrate that Defendant's proffered reasons were pretextual, Plaintiff alleges that before his injury, Defendant rated Plaintiff's performance as "meeting expectations," but after his injury, Defendant repeatedly disciplined Plaintiff for being tardy while never formally addressing his request for excused tardies.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 29-30 (Dkt. No. 17)).  Even assuming Plaintiff's allegation is true, it still does not demonstrate that Defendant's proffered reasons for terminating Plaintiff were pretextual.  It is simply a statement of fact with a subtle invitation for the Court to infer pretext.

Defendant presented admissible evidence that Plaintiff was terminated for taking excessive breaks after Plaintiff was placed on Decision Day status.  Plaintiff's next violation resulted in immediate termination.  Defendant has shown a legitimate, non-discriminatory reason for terminating Plaintiff.  Plaintiff has not presented adequate evidence that Defendant's proffered reasons for terminating Plaintiff were pretextual.  For the reasons above, Defendant is entitled to summary judgment on Plaintiff's discrimination claim.

## B.  FAILURE TO ACCOMMODATE

### 1.  Legal Standard

To establish a prima facie case of failure to accommodate under the ADA, Plaintiff must

14

demonstrate: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Bones v. Honeywell Int'l, Inc.*, 223 F. Supp. 2d 1203, 1218 (D. Kan. 2002) *aff'd* 366 F.3d 869 (10th Cir. 2004) (citations omitted).

**2. Accommodation Analysis**

Defendant made three requests for accommodations in February 2007: (1) a request to not wear Defendant's smock; (2) a request to have access to a non-water beverage on the work floor; and (3) a request for a flexible start time. Each of these requests are discussed below.

**a. Plaintiff's Request not to wear Defendant's Vest or Smock**

Both parties agree that Plaintiff made a request to be excused from wearing Defendant's vest or smock. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 34 (Dkt. No. 17)). Both parties also agree that Defendant made a company-wide decision to eliminate the requirement that Defendant's employees wear the vest or smock after Plaintiff made his accommodation request. *Id.* Plaintiff's request regarding the vest and smock is thus moot. Defendant is entitled to summary judgment with respect to Plaintiff's request regarding the vest and smock.

**b. Plaintiff's Request for a Non-Water Beverage on the Work Floor**

Plaintiff also requested an accommodation to have access to a non-water beverage on the sales floor. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 32 (Dkt. No. 17)). Plaintiff alleges that Defendant did not act upon his request. *Id.* But Defendant points out that "Plaintiff does not dispute [Defendant's] affidavit evidence that [Plaintiff] drank coffee on the sales floor and was

15

never subject [to] discipline for that conduct."  (Def.'s Reply Supp. Mot. Summ. J. 3 (Dkt. No. 19)).

Because Plaintiff admits to having access to a non-water beverage on Defendant's work floor without being disciplined, Plaintiff's request for an accommodation for a non-water beverage on the work floor is moot.  Defendant is entitled to summary judgment with respect to Plaintiff's request for an accommodation as to a non-water beverage on the work floor.

### c.  Plaintiff's Request for a Flexible Starting Time

Plaintiff made two requests for a flexible starting time.  The first was in July 2006, following his hand surgery.  It is undisputed that Defendant granted Plaintiff's request for a flexible starting time.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 26 (Dkt. No. 13)).   This request is thus moot.

Plaintiff made a second request for a flexible starting time in September 2006, following his reassignment to the Connections Center.  There are two issues to be addressed regarding Plaintiff's second request.  First, there is some confusion between the parties whether Defendant granted this request.  Plaintiff insists he was granted a flexible start time.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 21 (Dkt. No. 17)).   If this is the case, then Plaintiff's claim is moot.

If, as Defendant maintains, Plaintiff was not granted this flexible start time and was only granted a change in his hours of availability, then the issue becomes whether Plaintiff's request for a flexible starting time was reasonable.  (Def.'s Mem. Supp. Mot. Summ. J. ¶ 25 (Dkt. No. 13)).  However, in June 2007, Plaintiff submitted an Associate Change Form to amend his available hours.  *Id.* at ¶ 29.   Defendant granted this change and there were no further issues

with Plaintiff's tardiness thereafter.  *Id.* at ¶ 30. Consequently, Plaintiff's request was rendered

moot by his 2007 Associate Change Form and there is no reason for the Court to address the

reasonableness of Plaintiff's request for a flexible start time.

Defendant is entitled to summary judgment with respect to Plaintiff's request for an

accommodation as to a request for a flexible starting time because his requests were granted

twice: once in July 2006, and a second at a point no later than June 2007.  In addition, because

all of Plaintiff's requests for accommodation were rendered moot, Defendant is entitled to

summary judgment on the entirety of Plaintiff's failure to accommodate claim.

## C.  RETALIATION

### 1.  Legal Standard

The ADA prohibits an employer from retaliating against an employee with a disability

who engages in protected activity.  42 U.S.C. § 12203 (a), 29 C.F.R. § 1630.12.  To establish a

prima facie case of retaliation, Plaintiff must show: "(1) that he engaged in protected opposition

to discrimination; (2) that a reasonable employee would have found the challenged action

materially adverse; and (3) that a causal connection existed between the protected activity and

the materially adverse action."  *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir.

2007) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir.

2006)); *see also Hinds*, 523 F.3d at 1202.  Like a discrimination claim, the burden then shifts to

Defendant to offer a legitimate, non-discriminatory reason for the retaliatory action or

termination.  *Proctor*, 502 F.3d at 1208.  The burden then shifts back to Plaintiff to show that

Defendant's proffered reason is pretextual.  *Id.*

**2.  Retaliation Analysis**

    **a.  Plaintiff's Prima Facie Case**

The issue before the Court under this claim involves the third element that Plaintiff must demonstrate to establish a prima facie case of retaliation: that a causal connection exists between Plaintiff's protected activity and the materially adverse action against Plaintiff.  Plaintiff's protected activity was his written request for accommodations in February 2007.  The materially adverse action against Plaintiff occurred when Defendant terminated him in October 2007.

Under well-established Tenth Circuit precedent, "[u]nless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).  In the Tenth Circuit, "a three-month period, standing alone, is insufficient to establish causation."  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted); *see also*, *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 2007) ("[T]he three-month period of time between her protected activity and termination was insufficient to establish a causal connection").  In the present case, Plaintiff's protected activity took place in February 2007.  Plaintiff was terminated in October 2007.  Under Tenth Circuit precedent, this eight month window is insufficient to establish causation between Plaintiff's protected activity and his termination.

To circumvent this fact, Plaintiff makes two additional arguments.  First, Plaintiff argues that the February 2007 written request for a reasonable accommodation was not his only protected activity.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 37 (Dkt. No. 17)).  Plaintiff argues

that he also engaged in a protected activity when he complained about not receiving his requested accommodations.  *Id.*  He bases this allegation on an undated, handwritten note that Plaintiff appears to have written to his manager in the Connections Center.  *See* Pl.'s Exhibit S (Dkt. No. 18-4).  Plaintiff offers no evidence as to why this letter is a protected activity, does not indicate when this letter was written, or show that Defendant received the letter.  Moreover, Plaintiff does not offer any evidence that this letter is in any way connected to Plaintiff's termination or the other adverse actions that Plaintiff alleges below.  Accordingly, Plaintiff's argument fails.

Second, Plaintiff argues that his termination in October 2007 was not the only adverse action that Defendant took against Plaintiff.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 38 (Dkt. No. 17)).  Plaintiff alleges Defendant engaged in other adverse actions against Plaintiff when it did not formally investigate his complaints contrary to Defendant's Discrimination and Harassment Policy, and that Defendant disciplined him on issues related to his disability.  *Id.* at 39.  These arguments also fail.  Plaintiff has presented no evidence that Defendant's failure to formally investigate Plaintiff's complaints qualifies as an adverse action.  Additionally, other than the coachings themselves, Defendant did not suffer any adverse employment action as a result of his being disciplined for being tardy.  Plaintiff has failed to demonstrate a causal connection exists between his protected activity and his termination, and, consequently, Plaintiff has failed to establish a prima facie case of retaliation.

### b.  Defendant's Legitimate, Non-Retaliatory Reason for Terminating Plaintiff

Even assuming that Plaintiff could establish a prima facie case of retaliation, the Court

has already determined as a matter of law that Defendant terminated Plaintiff for a legitimate, non-retaliatory reason. *See supra* pp. 12-14. As previously outlined in the Court's analysis on Plaintiff's discrimination claim, it is clear that Defendant terminated Plaintiff from employment after Plaintiff was coached for unauthorized excessive breaks following Plaintiff's placement on Decision Day status. *See supra* pp. 12-14. Plaintiff was subject to immediate termination in accordance with Defendant's progressive discipline policy. *See supra* pp. 12-14. Defendant clearly terminated Plaintiff for a legitimate, non-retaliatory reason.

Furthermore, this Court has already ruled that Plaintiff cannot establish that Defendant's proffered reasons for terminating Plaintiff were merely pretextual. *See supra* pp. 13-14. Defendant's motion for summary judgment as to Plaintiff's claim of retaliation is thus granted.

## D.  WRONGFUL TERMINATION

### 1.  Legal Standard

In Utah, employment relationships entered into for an indefinite period of time are presumed to be at-will. *Touchard v. La-Z-Boy, Inc.,* 148 P.3d 945, 948 (Utah 2006). When employment is at-will, either party may terminate the employment for any reason (or no reason) except where prohibited by law. *Id.* "Accordingly, an employer's decision to terminate an employee is presumed to be valid." *Id.*

A discharged employee can overcome this presumption in three narrow situations by showing: (1) there is an agreement that the employment may be terminated only under certain conditions; (2) a statute or regulation restricts the right of an employer to terminate an employee; or (3) the termination of employment violates a clear and substantial public policy. *Id.*

**2.  Wrongful Termination Analysis**

Plaintiff bases his wrongful termination claim on the third narrow situation: that he was terminated by Defendant in violation of a clear and substantial public policy.  Complaint ¶¶ 67-70.  Plaintiff asserted in his Complaint that this action was brought pursuant to the ADA, ADEA, and Title VII.  *See id.* at Intro., ¶¶ 3, 34.  However, Plaintiff only asserts facts that have a basis for relief under the ADA.  *See id.* at ¶¶ 63-64.  Consequently, the Court will only review Plaintiff's wrongful termination claim in light of the ADA.

The public policies that Plaintiff alleges were violated are "federal and state statutes on non-discrimination, employee health and safety, workers' compensation, and employee compensation and benefits."  Complaint ¶ 68.  In other words, the public policies that Plaintiff alleges to have been violated invoke the same discrimination law – the ADA – at issue in his other claims.  Because the Court has already determined that Plaintiff's claims under the ADA fail as a matter of law, Plaintiff cannot succeed on his wrongful termination claim based on the same policy.

In addition, Plaintiff's wrongful termination claim is also preempted by Utah's anti-discrimination statutes.  *See Gottling v. P.R., Inc.*, 61 P.3d 989 (Utah 2002) (holding that the Utah Anti-Discrimination Act "preempts all common law causes of action for discrimination regulation, or harassment by an employer on the basis of sex, race, color, pregnancy, age, religion, national origin, or disability").

Finally, the Court agrees with Defendant that the allegations Plaintiff puts forth on the second-to-last page of its opposition memorandum that Defendant fired Plaintiff for exercising

his rights to workers compensation are untimely. *See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 48 (Dkt. No. 17).  Plaintiff failed to allege in his Complaint that his workers' compensation benefits had anything to do with his termination.  The Court will not allow him to allege them now.

Ultimately, it is Plaintiff's burden to prove that he was terminated in violation of public policy.  Based on the analysis above, Plaintiff has failed to do so.  Defendant is therefore entitled to summary judgment on Plaintiff's wrongful termination claim.

## IV.  CONCLUSION

For the reasons stated in the analysis above, the Court GRANTS Defendant's Motion for Summary Judgment as to all four of Plaintiff's claims against Defendant.  Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

DATED this 18th day of June, 2012.

_____
Dee Benson
United States District Judge